WYLIE BLEWITT, ADMINISTRATOR OF ARABELLA BLEWITT, DECEASED, *vs.* JAMES NICHOLSON AND WILLIAM N. AVERITT, EXECUTORS OF MALCOLM NICHOLSON, DECEASED.

A grant of administration in this State to the husband by virtue of his marital rights upon the estate of the wife, she being a non-resident at the time of her death, and dying in another State, but entitled to effects and property in this State, is valid under our laws.

Appeal from a Decree in Chancery rendered in Gadsden.

*Carmack & Baker,* for Appellant.

*Thompson & Dupont,* for Appellee,

HAWKINS, J :

There was a bill filed in the Court below by Blew't', appellant, the administrator of his deceased wife, to recover property alleged to belong to her in the hands of the executor of her father Malcolm Nicholson.

The bill states that the said Malcolm Nicholson died, leaving a will dated 18th November, 1838, and of which James Nicholson and William N. Averitt, were appointed executors, and to whom letters testamentary were duly granted. That in the year 1844, Blewitt (the appellant and complainant) intermarried with Arabella the daughter of the said testator, and that after the death of her father, she removed to the State of Georgia where she resided up to the time of her death, which occurred in December 1844.

That on 8th January, 1845, letters of administration were granted to the complainant Blewitt by the Judge of the county Court of Gadsden county, and that Arabella, together with the other children of the said Malcolm Nicholson, and his widow, were devisees under the will of the said Malcolm, by which they were entitled to an equal share of the real and personal estate remaining in the hands of the said executors after the deduction of the specific legacies, and that these portions with the exceptions of such assets as have been handed over to Mary, the wife of said Malcolm, were in the hands of said executors and within the jurisdiction of the Court. The bill charges that the complainant as administrator of his wife had made

demand upon the said ex·cutors, requiring of them a specific performance of the trust under the will of Malcolm Nicholson, requiring them to set apart and deliver to him the complainant, as administrator, the portion and share his late wife had been entitled to in the estate, but that they refused to do so.

It is admitted in the answer that Malcolm Nicholson died and left a will and that it was admitted to Probate as alleged in the bill, and that the respondents James Nicholson and W. N. Averitt duly qualified as executors, that Arabella the late wife of complainant was one of the children of said Malcolm Nicholson, and a beneficiary under his will. That sometime after the death of her father she went to the state of Georgia with a view of visiting her mother, who had removed to that State, and that while upon this visit she intermarried with the complainant, and for anything that the defendants knew to the contrary, continued to reside with him as his wife up to the time of her decease, which occurred about the time mentioned in the bill of complaint. That no partition or apportionment of the estate of her father had been made to her prior to her death, nor has any been made to any of the children up to the (then) present period. Without denying the grant of letters of administration to complainant, the defendants in substance contend, that if Arabella the wife of complainant, was at the time of her decease a citizen of the State of Georgia and died within its limits, then that the alleged grant of letters of administration to complainant was null and void, and conferred no right upon complainant to maintain his bill of complaint as administrator in right of his late wife, the said grant being in derogation of the laws of the State.

To this answer there is a general replication.

It will be seen upon this statement of the pleadings thus succinctly made, that the following proposition is brought directly before the Court for its decision.

Is a grant of administration valid by our law when made to the husband by virtue of his marital rights upon the estate of the wife, she being a non-resident at the time of her death and dying in another State, but entitled to property and effects within the limits of the State of Florida.

The negative of this proposition is assumed by the counsel for the appellee and it is contended that the grant of administration to Blewett is void, because the Court which made it was one of limited jurisdiction, a creature of the statutes, and if not embraced within

these statutes, the act of the Court in making the grant was a nullity, and that the judge of the county Court of Gadsden has transcended his powers in making the grant for the above reasons.   There can be no doubt as asserted, that a Court of limited jurisdiction must strictly pursue the authority conferred by the power creating · it, and that when its jurisdiction is defined, any act transcending the limits or boundaries of that jurisdiction is void.   It is proper too that these Courts should be kept and restrained within the jurisdiction delegated to them.   They resemble special agents, possessing certain specific powers, but when these are not exceeded their decisions are as conclusive (until reversed by an appellate and superior tribunal,) and carry with them the same force as Courts of general jurisdiction.

It would of course be exceedingly improper to clothe these lim-.ited tribunals with constructive powers, or such as are not literally or virtually given them ; but, at the same time we must be careful not to deprive them by a too rigid or refined construction of that authority which is requisite and necessary to carry out the end and purpose of their creation, or is incident to grant of power specifically or generally conferred.

While admitting the correctness of the proposition of the counsel for the appellee in the abstract, we are compelled to deny its application to the case at bar.

It is very true as alleged, that our statutes in relation to the granting of letters of administration do not expressly *or totidem verbis* provide for the case of a person dying beyond the limits of the State, or who was a non-resident at the time of his death, and who may have been entitled to goods, chattels, or lands within this State.   This may or may not have been a *casus omissus,* though it no doubt was ; but we think the enquiry unimportant, as we deem all cases of the nature above alluded to, fully provided for and embraced in the grant of jurisdiction to the Judges of the County Courts under our Territorial Government.

By the eighth section of the act, passed February 17th, 1833, it was enacted, that the Judge of each County Court, " shall have power either in open Court or in vacation, to take the probate of wills, grant and revoke letters testamentary, and letters of administration, appoint and displace guardians of infants, orphans, idiots, lunatics, and persons *non compos mentis,* and to make all necessary orders for issuing of process and notices.   That letters testamentary or of ad-

ministration so granted by the said Judge shall be issued by the Clerk, and bear teste in the name of said Judge. That said Judge shall also have power to order sale and distribution in all cases according to laws of estates, testate or intestate, and shall *have and exercise general powers* as a *Judge of Probate,*" Duval's Comp., 276. By the 4th section of the law of 1828, it is enacted " That it shall be the duty of the County Courts, in the several Counties in this Territory in term time, and of the Judges of said Courts in vacation, to take proofs of all last wills and testaments, and to grant probates, letters testamentary, and letters of administration, with or without any will annexed, and to do and perform all matters and things enjoined on said Courts, or the Judges thereof in vacation, to the estates of deceased persons." Duval Comp., 168.

Let us cast an eye to the jurisdiction of the Courts of ordinary in England, and we will find a strong similitude to those of the late Judges of the County Courts. In ancient times, by the English law, when a man died without making disposition of such of his goods as were testable, the King as *parens patriæ* used to seize the goods of the intestate to the intent that they should be preserved for the burial of the dead, the payment of debts, and the advancement of the family. This prerogative of the King was exercised for some time by his own minister of Justice, and probably in the County Courts, besides being delegated as a franchise to many lords of manors and others who possess this right of granting administration by prescription.

This same power was afterwards granted to the prelates, who on account of their superior sanctity were conceived capable of disposing of the property most for the spiritual benefit of the deceased. The goods of the intestate being thus vested in the ordinary, as trustee, to dispose of them for pious uses, the clergy took to themselves the residue of the deceased's estate, after the *partes rationalibus* of the wife and children had been deducted, without even paying his lawful debts.

To remedy this, the statute of Westm. 2, (13 Ed. 1st, C. 19,) was passed, declaring that the ordinary should be bound to pay the debts of the intestate, as far as his goods extended. Still however, the residue after the payment of debts remained with the ordinary, and as a remedy for this evil the statute of 31st Edward 3, was passed, providing that the ordinary should depute the next and most lawful friends of the deceased intestate to administer his goods, to demand

and recover as Executors the debts due the intestate, and to be accountable to the ordinaries as executors were. The administrators were the officers of the ordinary, appointed by him in pursuance of this statute, and their title and authority were derived from the ecclesiastical Judge by grants which are usually denominated letters of administration. 1 Williams on Ex., 236–7–8. Toller on Ex., 56. 2 Black. Com., 495.

In giving this brief sketch of the rise and history of administration, we are not to be understood as asserting that the ecclesiastical law *as such* is in force in Florida by virtue of any of our statutes, which have adopted the common law of England, and statutes of a general nature down to the 4th of July, 1776 ; but so far as " the law prevailing in the ecclesiastical courts on the subject of wills, executors, and administrators, was by various English statutes, and by recognition in the English Courts, part of the law of England," it would follow that it was embraced by our statutes. Preface to Swinburn on wills—cited by a member of this Court on page 380, of 1st Florida Reports. There is certainly a strong analogy between the powers, duties and jurisdiction of the ordinary of England, and those conferred upon the Judges of the County Courts under the Territorial *regime,* and now appertaining to the Judges of Probate of the State. It is true that these grants of power are derived from different sources—in England all judicial power emanating from the Crown—in our Country from the people conferring it through their constitutions and statutes. This analogy as to the jurisdiction of these tribunals being established there would seem to be as much propriety in following the decisions of the ecclesiastical Courts of England when applicable to the subject matter in dispute, and when not conflicting with our statutes, as those of her Courts of common law.

We cannot see that there is any valid objection to the granting of letters of administration by the Judge of the County Court of Gadsden County to the complainant Blewitt. The non-residence of his wife at the time of her death is not such a disability as to prevent the granting administration. The case of *Griffith vs. Griffith,* Sayer 83, cited on page 188 of 1st Williams on Executors, decides and sustains this principle. " This was an action of debt by an administrator, and it appeared by the declaration, that her letters had been granted by the Bishop of Bristol ; the defendant pleaded that the deceased died upon the high seas, out of the jurisdiction of the Bishop

of Bristol, and that the letters of administration were therefore void." Upon demurrer the letters were holden good, and Lee, C. J., said that the right of granting letters of administration is not founded upon the dying of an intestate within a diocese ; but upon his leaving goods there." So too it is laid down in the same work (285, 1st Williams on Ex.:) " If the intestate was domiciled in a foreign Country, within the kings dominions out of England, and left assets in this Country, administration must be taken out here, as well as in the Country of domicile." And in the case of Scarth *vs.* the Bishop of London, 1 Hagg., 625, Sir John Nicoll held that though there were some *dicta* to the effect that the bishop had no jurisdiction where the party does not *die* within his diocese, and that his death within the diocese is essentially necessary to found his jurisdiction, yet such authorities were not sufficiently clear to induce the Court to overturn the established practice."

These and other cases which might be cited, establish the principle that the question of jurisdiction as to the granting administration is made to depend on the locality of the property at the time of the death of the intestate, when it occurs beyond the limits of the State, and that the grant in such a case is not null or void, but good and valid.

While our statutes are silent as to the granting of administration when the death occurs beyond the limits of the State, and only provide in such cases for the Probate of wills, still there is no restriction prohibiting such administration, and we have already given our opinion that this omission is cured by the general grant of power to the judges of the county Courts. The words " the Judge shall have and exercise *general powers* as Judge of Probate," seem clearly to confer a plenary and general jurisdiction upon the subject of administration. The statute provides that if a person die out of the Territory (State) without property therein, but with debts due to such person by persons living in the Territory, letters testamentary or of administration, may be granted for the collection of such debts. We cannot think that the legislature after the passage of such a law ever intended, that administration should be refused in cases where there was property real and personal to be administered. It is contended however that there was design in the Legislature in not thus providing for this case, because we have a statute enabling executors and administrators who shall produce probate of wills or letters of administration authenticated under the

act of Congress of 1790, shall be authorized to maintain actions in the several Courts of the territory, under the same rules and regulations as other plaintiffs. Duval 105. Thomp. Dig. 349. But this law was passed in 1829 a year after the law directing the granting of probate and administration and we are informed too, that this law was passed in the first place, many years anterior to 1828, the time of its re-enactment. It is very possible that the law of 1829, was passed to remedy the omission of the law of 1828 and to a certain extent may be said to do so, but still it takes away no jurisdiction previously conferred upon the county Judge. But we think the better opinion is that the intention of the legislature in passing the law of 1829 was for another purpose. "It is the general doctrine of the common law (says Judge Story) recognised both in England and in this country, that no suit can be brought or maintained by any executor or administrator, or against any administrator or executor in his official capacity in the Courts of any other country except that from which he derives his authority to act in virtue of the probate and letters testamentary or the letters of administration therein granted him. But if he desires to maintain any suit in any foreign country, he must obtain new letters of administration and give new security according to the general rules of law prescribed in that country before the suit is brought." Story conflict of Laws, 421–2. We think therefore that for the purpose of obviating this necessity of taking out new or ancillary letters of administration, that the law of 1829 was passed, enabling foreign executors or administrators to maintain suits directly upon complying with the requisitions of the statute.

Nor can we deem the administration granted in this case void because made to a non-resident. The statutes have not made non-residence a disqualification, and it is expressly declared, that "letters of administration shall be granted to the representatives of the intestate who apply for the same, preferring first the husband or wife."— Thompson Dig. 196. By the law of England it is no incapacity to be an administrator that the next of kin is an alien. 295 Williams on Executors. Comyns Dig., Administrator B. 6.

The letters of administration granted to complainant stand unrevoked and in full force, and unless a clear case is made out of want of jurisdiction in the officer granting them, we cannot disturb them, but must presume that all the doings of the Judge in the prem-

ises, being within the scope of his jurisdiction, were *reta acta* and in accordance with law.

*Per Curiam :*—It is therefore ordered, adjudged and decreed, that the decree rendered in the Court below be reversed, and the cause be remanded thither for further proceedings in accordance with principles of law and equity.